D. A. HALE, PLAINTIFF IN ERROR, V. F. P. WIGTON, DEFENDANT IN ERROR.

1. **Pleadings:** AMENDMENT. Where the filing of an amended pleading is necessary to enable a party to prove any cause of action or matter of defense in his case, it is error in the trial court to deny the application of such party to file such amended pleading at any time after the filing of a defective pleading, before or after trial; but otherwise, where such amended pleading is not necessary to the admission of material testimony.

2. ————: UNNECESSARY WORDS STRICKEN OUT ON MOTION. Words in a pleading, other than the formal parts thereof, which are not necessary as the foundation of pertinent and proper testimony to prove the action or defense or some part thereof, of the party filing such pleading, may be stricken out on motion at any time before trial; otherwise, where such words are necessary as a foundation for such testimony.

3. **Chattel Mortgage:** FORECLOSURE: PAYMENT PENDING SALE: LIEN FOR FEED AND CARE. Where S. placed a chattel mortgage executed to him by G. M. on a certain horse in the hands of J. M. to foreclose, J. M. placed the horse in his own stable to be fed and cared for, and proceeded to advertise the horse for sale on foreclosure. Pending the sale, S. M., a personal security on the note, to secure which the mortgage was given, tendered to S. the amount due on the note and mortgage, principal and interest. S. accepted the tender and delivered up to S. M. the note and mortgage and ordered J. M. to proceed no further in foreclosing the mortgage. *Held*, That J. M. had no lien on the horse for his feeding and care. [MAXWELL, CH. J., dissents.]

ERROR to the district court for Madison county. Tried below before CRAWFORD, J.

*N. A. Rainbolt,* for plaintiff in error.

*Wigton & Whitham,* for defendant in error.

COBB, J.

It appears from the record in this case that the action in the district court was replevin, brought by the plaintiff

in error as plaintiff against the defendant in error as defendant, for the recovery of the possession of a horse. A trial was had to the court, which found for the defendant: "That at the commencement of this action the defendant had a special property in the horse in controversy and was entitled to the possession of the same. The court further finds the value of such property to be $68, and the value of the use of the same since the commencement of this action to be $70," and after overruling a motion for a new trial and one in arrest of judgment, adjudged: "That the defendant have a return of the property taken on said writ of replevin, or in case a return of said property cannot be had, that he recover of said plaintiff the value of defendant's special property therein assessed at $68, and also, and in either case, that he have and recover of the plaintiff his damages for withholding the same, assessed at $70, and costs," etc.

It further appears that after the trial and the taking down of the testimony by the official reporter of the court, his notes of such testimony were lost and could not be found, and that thereupon the parties, plaintiff and defendant respectively, stipulated as to the facts and evidence in the case, which stipulation was certified by the judge as the bill of exceptions in the case, and is substantially as follows:

"George Mather, one of the makers of said note and mortgage, set out in the stipulation and admitted to be genuine, is sole principal on said note, and Samuel Mather and Leroy C. Mather are sureties only on said note for said George Mather. Said mortgage and note, after said note becomes due, were placed in the hands of Searles & Kelley, attorneys, by the authority of the owner of said note and mortgage, for collection and foreclosure. Searles & Kelley thereupon placed the said mortgage in the hands of Joseph Martin, with instructions to said Martin to take the property therein named and do all things necessary in

the foreclosure of said mortgage. Immediately thereafter said Martin by virtue of said mortgage took the horse in controversy and proceeded to advertise the same for sale under the mortgage; in the mean time caring for and feeding said horse in his livery stable.

"Before the day fixed for the sale of said horse under said mortgage, and while the said horse was in possession of and being fed and cared for by said Martin, said Samuel Mather, as surety on said note for said George Mather, paid to said Searles & Kelley the full amount demanded by them on said note and mortgage, and said note, endorsed by them in blank by D. Smith the payee and mortgagee, was then delivered to said Samuel Mather by said Searles & Kelley, and the mortgage assigned to said Samuel Mather. Said Martin was then instructed by said Searles & Kelley to proceed no further with the foreclosure of said mortgage. Samuel Mather then, and immediately after payment of said note as above set forth, demanded the possession of said horse from said Martin, but Martin refused to deliver said horse to said Samuel Mather until his charges for taking, keeping, and caring for said horse were paid. This occurred October 12, 1882.

"On or about December 2, 1882, said Martin, not having been paid his charges for taking, feeding, and caring for said horse, issued a notice (set out in said stipulation) addressed to Searles & Kelley, A. P. Pilger (?), Samuel Mather, and D. Smith, setting out the nature of his charges and accruing charges for keeping, feeding, and caring for the said horse, demanding such payment from them, and notifying them that unless the same should be paid within five days from the date of the service of said notice upon them, that he would proceed to sell said horse at public auction to satisfy said claim," etc.

. There also appears in the stipulation a copy or exhibit of a notice of a public sale of said horse by said Joseph Mather to satisfy his claim for keeping, feeding, and caring

for said horse, and in which it is recited that the said claim then remained unpaid, and that payment thereof had been demanded and refused. Said notice bears date the 3d day of December, 1882, and by its terms the said sale was to take place on the 19th day of December, 1882, at 10 o'clock A.M., at the barn of said Joseph Mather, at Madison, Madison county, which notice was posted in five public places in the village of Madison, Madison county, for three weeks prior to the day of sale mentioned therein, and was published prior to the time of said sale in the Elkhorn Valley *News*, a newspaper printed in said county and of general circulation. It also appears that, pursuant to said notice, and at the time and place therein mentioned, the said Martin offered said horse for sale at public vendue, and sold said horse to the plaintiff and delivered the possession thereof to him. It further appears that said Samuel Mather did not appear at said sale nor forbid the same.

It further appears from said stipulation that the assignment or transfer executed by the said Samuel Mather, a copy of which is attached thereto, is genuine. By said assignment the said Samuel Mather, under date of the 13th January, 1883, sold and assigned to the defendant all the claim and demand which he, the said Samuel Mather, had against George Mather by reason of him, the said Samuel Mather, having paid as surety the note hereinbefore mentioned, describing the same, together with all the rights and privileges to which he, the said said Samuel Mather, had been subrogated by reason of such payments; together with all his rights and privileges in and concerning the chattel mortgage and the property thereby mortgaged, etc. The said stipulation contains the following further clauses : " It is further agreed that neither Samuel Mather or the defendant have ever been repaid the money paid by Samuel Mather on said note and mortgage."

" On the 20th day of April, 1883, defendant, by his agent, went to the farm of said plaintiff, who had con-

tinued in possession of said horse by virtue of said sale and delivery by said Martin to plaintiff, and took said horse from plaintiff's premises peaceably, but without plaintiff's knowledge or consent, plaintiff then not being present, and said farm then being in the charge of plaintiff's hired hand, who had been instructed by plaintiff to let no one have the horse. Defendant took said horse at said time by virtue of said assignment and chattel mortgage. * * *

" Defendant retained possession of said horse until the 24th day of April, 1883, when plaintiff, by virtue of this action, took possession of the same," etc.

" No tender of any sum was ever made to Joseph Martin or to plaintiff for the care, keeping, and feeding of said property, and no demand for the possession of said property was ever made upon plaintiff unless the facts herein set forth constitute such a demand. ·

* * * The value of said horse is $68, and the value of the use of the same during the time it has been in possession of plaintiff by virtue of this action is ——"

It was also stipulated that the court should fix the value of the use of said horse or damages, for its detention, in case it should find for the defendant from the evidence taken on the trial in the hearing of the court, the record of which had been lost.

It appears from the record, that upon the conclusion of the trial, and before the rendition of the judgment by the district court, the plaintiff applied to the court for permission to amend his petition, which was refused, and such order of the court is made a point of error by the plaintiff in his petition in error. This point comes first in order and will be disposed of.

In the case of *Mills v. Miller*, 3 Neb., 95, this court says: " While the entire subject of amendments is in the discretion of the court before which the case is tried, yet it is a legal discretion, and if it should be made to appear to a reviewing court that the amendment sought to be

made, of any pleading, process, or proceeding, is in furtherance of justice, it will be held to be error to refuse such amendment." I do not doubt the correctness of the above. To apply it to the case at bar: If the plaintiff was deprived of the benefit of any principle of law or the application of any item of evidence to which he would have been entitled, had his petition been as he proposed to make it, and which principle of law or item of evidence could, in the opinion of the court, possibly have led to a judgment in favor of the plaintiff in error, the judgment against him ought to be reversed. But was the amendment sought necessary in order to enable the plaintiff to present his entire case? I think not. The plaintiff in his brief says: "We do not now, nor did we at the trial of this cause, consider it necessary to file this amended petition in order to entitle plaintiff to recover, even though the facts proved establish only a special property in the horse in controversy. But if the view held by the district court during the progress of the trial, that 'under the facts proved, plaintiff's claim was but a special property in the horse, and the same not being plead he could not recover,' is correct, then it was error to refuse to allow the amended petition to be filed." Without differing with the plaintiff in the above proposition, I fail to see how the court could have decided the case on the theory that the evidence tended to prove that the plaintiff had a special property and that only in the horse; certainly such could not have been the case, if the testimony given before the court is fairly reproduced in the agreed statement of facts.

As will be more fully discussed further on, Joseph Martin, either in his capacity of agent of Searles & Kelly to foreclose the mortgage mentioned in the agreed statement of facts or as liveryman, having taken said horse to keep, feed, and care for, claimed a lien on said horse for such keeping, feed, and care, and undertook to foreclose such lien by advertisement and sale. The plaintiff at

tended such sale and became the purchaser of the horse thereat. The notice of sale is, that "I will sell at public auction the above and foregoing described property, or so much thereof as shall be necessary to satisfy my claim," etc. The sale made pursuant to this notice was either an absolute sale of the horse or no sale at all, to be determined by matters to be hereafter considered. The application therefore, on the part of the plaintiff for leave to file an amended petition in this cause, setting up a special property in said horse, and also the special facts and circumstances whereby he became possessed of such special property, was not calculated to lead to the elucidation of the truth, and therefore such amendment would not be in furtherance of justice. Hence to refuse permission to make it was not error.

It seems that the court, on motion of the defendant, struck out certain words from the plaintiff's petition. This is assigned for error.

The words stricken out are those whereby the plaintiff charges the defendant with having "wrongfully and unlawfully entered upon the premises of the plaintiff, and wrongfully took therefrom and from the possession of plaintiff, without plaintiff's knowledge or consent, said property." If these words were necessary as a foundation for any material evidence necessary or proper to the proof of the plaintiff's case, then the striking of them out of the petition was error; otherwise it was, under our system of practice, probably a matter of discretion on the part of the district court, with which this court will not interfere.

Counsel for plaintiff in error takes the position that these words were necessary in the petition to enable him to prove the wrongful taking of the property by the defendant. Was it necessary that he prove the wrongfulness of the taking, or that he prove the taking at all? At common law the action of replevin was frequently spoken of as replevin in the *cepit* and in the *detinet*, according to the facts of the case—the former where the taking of the

property was alleged to be tortious, or wrongful, the latter where the possession of the property by the defendant was admitted to have been lawful in its inception, but its detention was claimed to be wrongful. This distinction does not exist under the code. Now, so far as the defendant's connection with the property is concerned, it is only necessary to allege "that the property is wrongfully detained by the defendant; that it was not taken in execution," etc. The above strictly applies to the affidavit in replevin, but may be taken as indicating the requirement of the petition. Code § 181.    *Oleson v. Merrill,* 20 Wis., 487.

I am therefore of the opinion that the district court did not err in sustaining the motion of the defendant to strike the words above quoted from the petition.

But the main question raised by the record is, does the agreed statement of facts, certified as a bill of exceptions, show the plaintiff to be possessed of the right of property in the horse, or the right to its possession? Counsel for plaintiff in error in the brief put it in this wise: "Did Martin's sale transfer title?" This question he answers and argues in the affirmative under three heads—"1, because of the agreement under which he took possession; 2, because Mather acquiesced in the sale; 3, because the property was a pledge in Martin's hands, and the sale was strictly in conformity with the law governing the sale of pledges."

The agreement here mentioned doubtless is the chattel mortgage from George Mather to D. Smith. This is in in the usual form of chattel mortgages, and provides, "that in case of default made in the payment of the above mentioned promissory note, or in case of my attempting to dispose of or remove from said county of Madison the aforesaid goods and chattels, or any part thereof; or if at any time the said mortgagee or his assigns should feel unsafe or insecure, then and in that case it shall be lawful for the said mortgagee or his assigns, by himself or agent, to take

immediate possession of said goods and chattels wherever found, the possession of these presents being his sufficient authority therefor, and to sell the same at public auction, or so much thereof as shall be sufficient to pay the amount due or to become due, as the case may be, with all reasonable costs pertaining to the taking, keeping, advertising, and selling of said property," etc.

It is very clear that this contract gave a lien upon the horse, not only for the amount secured thereby, but for all reasonable costs pertaining to the taking, keeping, advertising, and selling the same. But whom did it give this lien to? Doubtless to D. Smith and his assigns. To be sure, by virtue of a provision of the mortgage, its possession was sufficient authority for taking possession of and selling the property. But Martin never had possession of the mortgage in his own right, but only as the agent of D. Smith, the owner. Martin's possession of the mortgage, as well as of the property, was the possession of Smith, his principal. According to the view of the plaintiff in error, Martin became possessed of a lien on the horse for his fees and charges in and about the foreclosing of the mortgage, in his own right, and independent of his principal. I am unable to see it in this light. True, the statute gives a lien for feeding and taking care of live stock in certain cases. Let us examine its language.

Sec. 28. chap, 4, Comp. Stats., reads as follows: "When any person shall procure, contract with, or hire any other person to feed and take care of any kind of live stock, it shall be unlawful for him to gain possession of the same by writ of replevin or other legal process until he has paid or tendered the contract price, or a reasonable compensation for taking care of them." Within the meaning of this language, it is obviously the contract, either express or implied, the procuring, contracting, or hiring which gives the lien, while the feeding and care will furnish the measure of damages for which such lien may be enforced.

Martin did not acquire a lien on the horse, because he was not procured, contracted with, or hired by any other person to feed and take care of it. It is claimed in effect that he was procured by Smith to foreclose the chattel mortgage on the horse, and that the care and feeding of the horse was a necessary incident to the foreclosure of the mortgage. The thing which Smith did through his attorneys, Searles & Kelly, was to appoint Martin his agent to foreclose the mortgage; and without saying that such agency did not carry with it sufficient authority to have empowered Martin to procure, contract with, or hire another to feed and care for the horse pending the foreclosure, so as to give such person a lien therefor under the statute, I do say that as between Smith and Martin the employment was purely a personal one, and no lien could arise thereon under the statute. Smith, through his agent Martin, had possession of the horse, holding him under the provisions of the mortgage for the purpose of foreclosure and sale. He had the right to retain such possession until the amount due on the mortgage for principal and interest and for accrued costs and expenses of foreclosure, so far as foreclosure had been made, had been paid or tendered. But if he choose to accept a less sum, and to deliver up the note and mortgage, his only muniments of title to the horse, he had the power to do so, and to thereby include his agent as well as himself, so far as any lien upon or right to the possession of the horse was concerned. It might be admitted that as against Smith, Martin had a lien upon the horse, or upon Smith's special property in the horse, for his feeding, care, and keeping; and yet when Smith accepted, as in full of all claims under the mortgage, the amount tendered by Samuel Mather, surrendered the note and assigned the mortgage to him, there was no longer any property in the horse to which such lien could attach, and hence such lien ceased to exist.

2.  Because Mather acquiesced in the sale.

It appears from the bill of exceptions, that upon the trial the plaintiff offered in evidence, and the court admitted over the objection of the defendant, the notice to Searles & Kelly, A. P. Pilger, Samuel Mather, and D. Smith, referred to in the fore part of this opinion, with the deputy sheriff's return endorsed thereon, of its service upon Samuel Mather and D. Smith.

While it will scarcely be contended that the mere certificate of the deputy sheriff was evidence of the service of this paper, yet as the defendant does not complain in this court of its reception, the service of the notice will be assumed to have been proved. But is the fact that Samuel Mather was served with such notice, and failed to attend and forbid the sale of the horse, sufficient to estop him to deny the legality of such sale? Counsel cites Story's Eq. Jur., § 1546, to this point. I quote the authority cited: " It is a universal law that if a man, either by words or by conduct, has intimated that he consents to an act which has been done, and that he will offer no objection to it, although it could not have been lawfully done without his consent, and he thereby induces others to do that from which they otherwise might have abstained, he cannot question the legality of the act he had so sanctioned, to the prejudice of those who have so given faith to his words or to the fair inference to be drawn from his conduct." The above, though cited from Story, was taken by that author from the opinion of Lord Chancellor Campbell in the case of *Cairncross v. Lorrimer*, The Jur. N. S., Vol. 7., part I., p. 149. By reference to the opinion it will be seen that the act which was held to work an estoppel in that case was an actual participation in the thing complained of for many years, hence that case furnishes no authority for for the case at bar. Upon a somewhat careful examination of cases and works upon the subject of estoppel, I fail to find that mere absence from the place of sale has ever been held to estop such absent party to deny its legality.

3.  Because the property was a pledge in Martin's hands, and the sale was strictly in conformity with the law governing the sale of pledges.

If the learned counsel means by the above, as I suppose he does, that the horse was a pledge in Martin's hands for the payment of his care and keeping, then I fail to agree with him at the outset.    There is certainly no fact stated in the agreed statement of a pledge to Martin, nor any fact from which it can be presumed that he would either have exacted a pledge as security from Smith for the care and keeping of the horse, or that Smith would have given such pledge. We have already seen, to my own satisfaction at least, that the employment of Martin as agent of Smith to foreclose the mortgage did not of itself amount to a pledge of the horse to him for his pay for his keeping pending the foreclosure, nor give him a lien on the horse therefor.

The district court rendered judgment for the defendant for a return of the property replevied, or in case a return could not be had, that he recover of said plaintiff the value of defendant's special property therein assessed at $68, and also, and in either case, that he have and recover of plaintiff his damages for withholding the same, assessed at $70, and costs of suit.

In the case of *Romberg v. Hughes*, 18 Neb., 579, this court, by the present CHIEF JUSTICE, in the opinion, said: " It is only in cases where a return of the property is had that the party to whom the property is returned is entitled to damages for the detention.    If, however, a verdict is rendered for the value of the property, the action in that regard being one for damages only, the measure of damages is the value of the property as proved, together with lawful interest thereon from the date of the unlawful taking." Citing *Hainer v. Lee*, 12 Neb., 452.    *Deck v. Smith*, 12 Neb., 389.

The judgment of the district court is reversed and

the cause remanded for further proceedings in accordance
with law.

REVERSED AND REMANDED.

REESE, J. concurs.

MAXWELL, CH. J., dissenting:

I am unable to concur in the opinion of a majority of
the court, and will briefly state the reasons for my dissent.
In this case the mortgagor had failed to pay the debt secured
by the mortgage when it became due, and being in default
the mortgagee employed Martin to take the mortgaged
property, consisting of horses, and advertise and sell the
same under the mortgage. Martin thereupon, by virtue of
of the mortgage, took the horses into his possession and
cared for them, and was proceeding as rapidly as possible
to foreclose the mortgage and sell the property. After
considerable expense had been incurred, the plaintiff, as
surety, went to the mortgagee and paid him the whole of
his demand on the mortgage, and took an assignment of
the same. He then demanded the property in question
without either paying or tendering to the defendant the
costs incurred by him in procuring, feeding, and caring for
the horses in question, while the defendant had them in his
possession preparatory to a sale of the same under the mort-
gage. The question presented is the right of the surety to
maintain replevin in such case.

The statute provides that " When any person shall pro-
cure, contract with, or hire any other person to feed and
take care of any kind of live stock, it shall be unlawful
for him to gain possession of the same by writ of replevin
or other legal process, until he has paid or tendered the
contract price, or a reasonable compensation for taking care
of the same." In a number of cases this court has held
that the legal title to mortgaged property is in the mort-

gagee, subject only to be defeated by performance of the condition. *Adams v. Nebraska City National Bank*, 4 Neb., 373. *Marseilles Manufacturing Co. v. Morgan*, 12 Neb., 69. *Nelson v. Garey*, 15 Id., 535. *Tallon v. Ellison & Sons*, 3 Neb., 74. *Tompkins v. Batie*, 11 Id., 151. The mortgagee, therefore, was the legal owner of the property in question, and as such owner entered into a contract with the defendant to take the property under the mortgage and foreclose the mortgage. This necessarily included feeding and caring for the horses until the sale; and this the proof shows that the defendant did. The surety, by paying the mortgage debt, was simply subrogated to the mortgagee's rights under the mortgage. If the property was being fed and cared for under a contract made with the legal owner, which the proof shows that it was, then the statute declares that such owner shall not maintain an action of replevin until he has paid or tendered the contract price, where the price has been agreed upon, or, where it has not, then a reasonable compensation for "*taking care of* the same." The assignee therefore takes the property subject to such claims. A different rule nullifies a plain provision of the statute, and by construction denies relief to the very class it was intended to protect, and practically overrules *Guthman v. Kearn*, 8 Neb., 502–508.